ROSE RICHARDS, ADMINISTRATRIX, APPELLEE, V. MATHIAS ABTS, APPELLANT.

287 N. W. 199

FILED JULY 21, 1939. No. 30680.

*F. J. Reed,* for appellant.

*James H. Anderson* and *Floyd E. Wright, contra.*

Heard before ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ., and CHAPPELL, District Judge.

PAINE, J.

This is an appeal by the defendant, Mathias Abts, in a workmen's compensation case, from an award entered in the district court in favor of Rose Richards, administratrix, for $15 a week for a period of 325 weeks, with burial expense of $150, and hospital and medical bills of $72. The defendant charged wilful negligence on the part of William Richards, deceased. From the award the defendant appeals.

On October 12, 1937, William Richards, an employee in the defendant's blacksmith shop, was engaged in welding a small leak in a 500-gallon molasses tank with an oxyacetylene torch. The tank exploded, killing Richards.

This is the second appearance of this case in this court, for on October 7, 1938, an opinion, written by Judge Carter, reversed and remanded the cause for a new trial. This is found in 135 Neb. 347, 281 N. W. 611, and in that opinion the facts are set out in greater detail.

An award was made by Judge Jackman, of the Nebraska workmen's compensation court, at Gering, on March 30, 1938. From this award defendant waived right of hearing before the entire compensation court, and appealed directly to the district court. The defense alleged by the defendant before the compensation court and district court, and also at the first hearing before this court, was that the deceased met his death by reason of his own wilful negligence, which barred a recovery under the workmen's compensation law. This court reversed the trial court at the former hearing for the reason that an offer of proof had been made to the effect that one Gibson had warned the deceased of the danger on several occasions, and the exclusion of this evidence was held to be prejudicial error.

In the retrial of this case in the district court, a written stipulation, signed by counsel for both parties, was introduced as exhibit No. 1, which set out all of the undisputed facts in the case.

Morris Gibson, a portion of whose evidence appears to have been rejected at the first trial, testified that he had lived at Morrill for 30 years, had been employed by John R.

Jirdon for the last 12 years, and had taken one or two molasses tanks for his employer to have leaks welded by the deceased, being the same sort of molasses tank that the deceased was working on at the time of his death. He detailed the conversation he had with the deceased at one time, when he said they noticed a kind of blue smoke that was raised when they were welding on the tank; that it had a bitter odor, and they wondered if it was explosive, and the deceased told him that he knew a chemist at the sugar factory at Mitchell, and he would inquire of him to see if there was any danger. Several days later, when Gibson was going by the blacksmith shop, the deceased told him that he had checked with the chemist, and that as long as the welding was done in open buildings, with plenty of circulation of air, there was no danger.

In the latter part of the summer, when Richards was welding on one of their tanks, Gibson said he removed the cap and told him that, as far as their tanks were concerned, he wished he would weld with the caps removed, and that the deceased just laughed and kind of joked about it, and that was the end of it.

On cross-examination Gibson said he had never studied welding, that the deceased was not an employee of his, and that, on the occasion when he took the cap off, the tank had not been inflated with a pump, and so far as this evidence on the part of Morris Gibson is concerned this court cannot see that it adds anything of vital importance to support the claim of the defense that it shows previous acts of negligence and of reckless indifference to safety, which defeats recovery, to secure which evidence of Gibson the case was remanded for a new trial.

At this last trial the defendant, to sustain his defense, produced the deposition of H. F. Reinhard, which was read in evidence. He testified that his office was at 30 East Forty-second street, New York City; that he was a chemical engineer by profession, and for the last eight years had been secretary of the International Acetylene Association, whose membership comprises all producers of such welding and

cutting apparatus, members of the engineering profession, operators and those having supervision of welding operations; that he was a member of the American Welding Society, and many other national societies. He testified that the use of an acetylene welding torch upon a thin metal 500-gallon tank which was entirely closed would be dangerous, and that welders were universally familiar with that fact. He testified that the association of which he is secretary publishes a pamphlet entitled, "Safe Practices for Installation and Operation of Oxy-Acteylene Welding and Cutting Equipment," and that on pages 39 and 40, under M-12, it gives as a rule never to do any hot work on drums, barrels, or tanks until they have been thoroughly cleaned; that steam will remove volatile materials; that washing with strong caustic soda solution will remove heavier oil, and wherever possible the container should be filled with water before any hot work operations are performed. Many other safety rules were given in this lengthy deposition read in evidence, and a hypothetical question was asked this expert, to assume that a 500-gallon tank, formerly containing commercial molasses, is empty except for molasses which may have adhered to the inside walls of the tank, and that the cap is screwed tight on the three-inch vent on the top of the tank, and that nothing has been done to free the tank of molasses, or residual molasses, or the vapors of gases, and the acetylene torch is applied, would such an act be dangerous? His answer was that within such a tank would be alcohol vapors produced by fermentation, and the torch might char residual molasses, producing combustible gases, which, when mixed with the air, would produce a violent explosion, and that all welding operators receive instructions, from the welding school, or from an experienced welder, as to all such facts.

This evidence is all very interesting and highly scientific, but we fail to find any proof in the record that the deceased ever attended any welding school, or read this safety manual for welders, or that he knew anything of the profession except what he had picked up, working in this blacksmith

shop, from the proprietor, where welding was only very incidental to the many activities carried on in the shop. The proof is lacking that the deceased deliberately, and of his own wilful negligence, failed to take any precaution which he had been taught in that blacksmith shop by his employer, or learned from his own experience.

In rebuttal the plaintiff called as a witness J. B. McDonald, the assistant superintendent of the Great Western Sugar Factory at Gering, Nebraska, for the last 14 years. He testified that he learned welding operations some 20 years ago, and for the last 10 or 12 years has had the supervision of welding operations at this factory, and with his crew of four or five welders he only takes charge of direct work when it is of a technical or unusual nature, at which time he sometimes does the actual welding himself.

He testified that he has read many manuals and handbooks on the subject, and keeps up to date with all the literature in the welding magazines, which he passes on to the welders working under him. He had been present in court and listened to the testimony taken, and said that the explosion of the molasses tank did not come from pressure, but from inflammable gases. He said the temperature of the flame of the acetylene torch is about 6,700 degrees, and that the application of flame from an ordinary tip could not raise the temperature of the air inside such a large tank to 212 degrees; that a small pressure of five pounds per cubic foot on the inside is not ordinarily dangerous, and that he would not consider it dangerous to attempt to close a small hole by welding a tank, with such a pressure in the tank, if there were no explosives or inflammable materials in the container; that in all their experience in handling molasses tanks and pipes at the factory, they make it a general practice to weld upon molasses containers without purging the container of residue molasses.

He testified that, if there were explosive gases in the tank, the tank would have exploded just the same, even though the vent of three or five inches in the top of the tank had been open, for when the gas ignites it expands so

rapidly that the vent could not take care of the pressure. He testified that he had heard the evidence that the deceased pumped some air into the tank with the air-pump, five or ten strokes, for the purpose of finding where the leak was, and that such a few strokes from a pump of that size would increase the pressure in a 500-gallon container very little.

This witness was subjected to a lengthy and vigorous cross-examination, going into the various physical laws of pressure, and various causes of explosions of large tanks, but, in the main, the bringing out of these many details did not change his testimony in chief to the effect that what the deceased had done was rather common practice, and nothing in the conduct of deceased would show any wilful negligence which would defeat an award in this case.

In discussing the law relating to this case, section 48-101, Comp. St. 1929, provides that the employee cannot recover if he was wilfully negligent at the time of receiving such injury. And it is further provided in section 48-107, Comp. St. 1929, that the burden of proof to establish wilful negligence of the injured employee shall be on the defendant.

Mere negligence is not sufficient, but such conduct must be shown on the part of the workman as manifests a reckless disregard of consequences coupled with a consciousness that injury will naturally or probably result.

"An employer who attempts to avoid liability on the ground that employee was wilfully negligent must prove a deliberate act knowingly done, or at least such conduct as evidences a reckless indifference to his safety." *Hoff v. Edgar,* 133 Neb. 403, 275 N. W. 602.

In *Ashton v. Blue River Power Co.,* 117 Neb. 661, 222 N. W. 42, being a compensation case, this court said: "In the absence of intoxication on part of the injured party, wilful negligence may be defined as (1) a deliberate act; or (2) such conduct as evidenced reckless indifference to safety. As a statutory term it involves more than want of ordinary care. It implies a rash and careless spirit, not necessarily amounting to wantonness, but approximating it in a degree, a willingness to take a chance."

In *Moise v. Fruit Dispatch Co.*, 135 Neb. 684, 283 N. W. 495, it was held by this court that, when an inveterate pipe smoker was warned not to smoke by one not his employer, but disregarded said warning, and lighted a match in the doorway of a gas-filled banana-ripening room, killing himself and three others by the explosion which followed, his widow might recover for his death, and that his negligence was not wilful, for he simply responded to an automatic habit, without the volition essential to a wilful act of negligence. Under this recent holding of this court, we cannot regard the acts of William Richards, deceased, in going about the business of welding the molasses tank as he did, to be so intentionally wilful, and with such a reckless indifference to his own safety, as prohibit an award in this case.

In a liberal interpretation of the workmen's compensation law, it is held that the deceased met his death while in his line of duty, and that the fatal accident arose out of and in the due course of his employment.

The plaintiff's attorney is allowed a fee of $150 in this court, and the award of the district court is hereby

AFFIRMED.